UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JM SMITH CORPORATION, d/b/a SMITH DRUG COMPANY, on behalf of itself and all others similarly situated,<br><br>          Plaintiff,<br><br> -against-<br><br>ASTRAZENECA PHARMACEUTICALS L P, ASTRAZENECA L P, ASTRAZENECA UK LIMITED, HANDA PHARMACEUTICALS, LLC, and PAR PHARMACEUTICAL, INC.,<br><br>          Defendants. | Dkt. No. 19 Civ. 7233 (CM) |

**ORDER GRANTING DEFENDANTS' MOTION TO TRANSFER**

McMahon, C.J.:

J M Smith Corporation d/b/a, Smith Drug Company ("Smith") brings this antitrust class action on behalf of itself and similarly situated direct purchaser plaintiffs ("DPPs") against Defendants AstraZeneca Pharmaceuticals L.P. and AstraZeneca L.P. (collectively, "AstraZeneca"), AstraZeneca UK Ltd. ("AZ UK"), Handa Pharmaceuticals, LLC ("Handa"), and Par Pharmaceutical, Inc. ("Par") (collectively, "Defendants").

All Defendants move to dismiss for lack of jurisdiction or improper venue; or in the alternative, to transfer pursuant to 28 U.S.C. § 1404. (Dkt. No. 68.) In a separate motion, they also moved to dismiss Smith's Complaint for failure to state a claim. (Dkt. No. 69.)

For the reasons stated below, Defendants' motion to transfer is GRANTED.

1

## BACKGROUND

*A. Parties*

Smith is a South Carolina corporation headquartered in Spartanburg, South Carolina. (Dkt. No. 1 at ¶ 2 ("Compl.").) Smith purchased branded and generic Seroquel XR from AstraZeneca and Par, respectively, during the proposed Class Period: "from September 29, 2011 until the effects of Defendants' conduct ceases." (*Id.* ¶¶ 34, 41.) AstraZeneca and other generic competitors launched their own versions of generic Seroquel XR in or around early May 2017. (*Id.* ¶¶ 21-22.)

AstraZeneca L.P. was a Delaware limited partnership headquartered in Wilmington, Delaware. It was dissolved on December 31, 2018, and all of its assets and liabilities were assumed by AstraZeneca Pharmaceuticals L.P. (Aff. of Matthew Bowden ¶¶ 4–5, Dkt. No. 68-7.)

AstraZeneca Pharmaceuticals L.P. is a Delaware limited partnership headquartered in Wilmington, Delaware. (Compl. ¶ 35.)

AZ UK is a U.K. company headquartered in London, United Kingdom. (*Id.* ¶ 37.)

Handa is headquartered in San Jose, California. (*Id.* ¶ 38.) While Smith asserts that Handa is a California LLC (*id.*), Handa explains that while it was previously a California LLC, in September 2016 Handa was registered as a Delaware LLC. (Aff. of Stephen D. Cary ¶¶ 3, 8, Dkt. No. 68-9.)

Par is a Delaware corporation presently headquartered in Chestnut Ridge, New York. (Compl. ¶ 39.) Prior to March 2015, Par maintained its principal place of business in Woodcliff Lake, New Jersey. (*See* Decl. of Terrell T. Stevens, Dkt. No. 82-1.)

*B. The Alleged Conspiracies*

This case arises from alleged conspiracies between and among Defendants to delay and suppress competition for generic versions of AstraZeneca's branded quetiapine fumarate

2

extended-release tablets, Seroquel XR®. Specifically, AstraZeneca entered into allegedly anti-competitive patent settlement agreements with Handa (later assigned to Par) and non-party Accord Pharmaceuticals, Inc. ("Accord").

Before generic versions of Seroquel XR entered the market, AstraZeneca sold branded Seroquel XR in the United States to the tune of $1 billion per year. (Compl. ¶ 2.) Handa, a generics manufacturer, was the first to file an Abbreviated New Drug Application ("ANDA") for the 50, 150, 200, and 300mg strengths of generic Seroquel XR. (*Id.* ¶ 3.) It also filed an ANDA for the 400mg strength, but it was not the first to do so. Rather, Accord filed the first ANDA for the 400mg strength generic Seroquel XR. (*Id.*)

Handa and Accord sent AstraZeneca Paragraph IV notice letters, each certifying that they would seek final FDA approval and intended to launch their generic Seroquel XR products prior to the expiration of AstraZeneca's follow-on patent, U.S. Patent No. 5,948,437 (the "'437 Patent"). Handa and Accord claimed the '437 Patent was invalid or otherwise would not be infringed by their generic products. (*Id.* ¶ 4.) The '437 Patent expired on May 28, 2017, and its regulatory exclusivities expired on November 28, 2017. (*Id.* ¶ 5.)

In 2008 and early 2009, AstraZeneca initiated patent infringement lawsuits against Handa and Accord in the District of New Jersey, alleging that Handa and Accord's respective ANDAs infringed the '437 Patent. (*Id.* ¶¶ 6–10.) Around October 1, 2011, AstraZeneca allegedly entered into two settlement agreements – one with Handa, the other with Accord – whereby the parties resolved the patent lawsuits; Handa and Accord agreed to delay their launches of generic Seroquel XR (in their respective strengths) until November 1, 2016; and AstraZeneca agreed not to launch an authorized generic ("AG") Seroquel XR until May 1, 2017. (*Id.* ¶¶ 15, 18).

3

On October 29, 2012, Par – another generics manufacturer – announced that it had acquired Handa's ANDA. As part of the agreement, Handa assigned Par the settlement agreement with AstraZeneca – including the right to market generic Seroquel XR on November 1, 2016. Par was required to share a portion of its profits from the sale of the generic with Handa. (*Id.* ¶¶ 16–17.)

Smith and the putative class of DPPs were harmed by the allegedly unlawful settlement agreements because (a) no generic Seroquel XR was available until November 1, 2016 and (b) only one generic was available for six months thereafter, until May 1, 2017. Absent the settlement agreements, (a) generics would have entered the market sooner and (b) AstraZeneca's AG would have launched at the time those generics entered the market – such that the DPPs could have acquired extended-release quetiapine fumarate at significantly lower prices substantially earlier.

Smith asserts five causes of action under the Sherman Act:

Counts I and II assert violations of Section 1 and Section 2, respectively, against AstraZeneca, Handa, and Par as to the 50, 150, 200, and 300mg strengths of Seroquel XR (*Id.* ¶¶ 185-201);

Counts III and IV assert violations of Section 1 and Section 2, respectively, against AstraZeneca as to the 400mg strength of Seroquel XR (*Id.* ¶¶ 202-16); and

Count V asserts a violation of Section 2 against AstraZeneca for monopolization and monopolistic scheme (*Id.* ¶¶ 217-22).

C. *Relevant Contracts*

Defendants assert that two agreements cover Smith's relationship with AstraZeneca: (1) a 2005 Wholesale Distribution Agreement ("Wholesale Agreement") (Ex. 1 to Defs.' Mot. to Dismiss, Dkt. No. 68-4) and (2) a 2011 Wholesale Distribution Services Agreement, amended in 2016 ("DS Agreements") (Exs. 2 & 3 to Defs.' Mot. to Dismiss, Dkt. Nos. 68-5, 68-6.) The

4

Wholesale Agreement appoints Smith as a non-exclusive distributor for AstraZeneca's products. The DS Agreements govern, *inter alia*, the level of inventory of Seroquel XR Smith must maintain.

Defendants identify the specific sections of the DS Agreements that require Smith to maintain both target inventory levels and stable purchase quantities of AstraZeneca products every month, including Seroquel XR in 50, 150, 200, 300, and 400mg strengths. (*See* Ex. 2 §§ 5.1, 11.2, Attach. G; Ex. 3 §§ 1.19, 3.2, 3.3, Attach. A-1.)

Smith characterizes the DS Agreements as imposing an obligation on Smith "to provide data to AstraZeneca and to refrain from speculative buying, in order to assist AstraZeneca 'to manage its product inventory,' 'minimize the potential of product unavailability,' 'better forecast future product demand,' and 'better manage inventory requirements from customers'; in exchange, AstraZeneca agreed to pay [Smith] certain monies." (Opp'n to Defs.' Mot. to Dismiss, Dkt. No. 73 at 21 (quoting Ex. 2 at 1; Ex. 3 at 1).)

The DS Agreements contain the same forum selection clause:

> **Jurisdiction.** The parties hereby irrevocably and unconditionally consent to the exclusive jurisdiction of the state or federal courts in the State of Delaware for any action, suit or proceeding arising out of or relating to this Agreement, and agree not to commence any action, suit or proceeding related thereto except in such courts.

(Ex. 2 § 20.2; Ex. 3 § 16.2 (emphasis original).) While the Wholesale Agreement does not contain a separate forum selection clause, Defendants note that the DS Agreements expressly state, "To the extent that the terms of the Wholesale Distribution Agreement and this Agreement conflict, the terms of this Agreement shall control." (Ex. 2 § 21; Ex. 3 § 17.) The DS Agreements are governed by Delaware law.

*D. Defendants' Motions to Dismiss*

Defendants move to dismiss for lack of personal jurisdiction under Federal Rule of Procedure 12(b)(2) and improper venue of Rule 12(b)(3). In the alternative, they ask this court to transfer all Seroquel XR cases to the District of Delaware under either § 1404 or § 1406.

For the reasons discussed below, Defendants' motion to transfer is GRANTED.

## ANALYSIS

In this case, it is prudent to address the motion to transfer before dealing with the issue of personal jurisdiction. *See Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979). Defendants contest this court's personal jurisdiction over all Defendants except for Par. However, all Defendants are either subject to general personal jurisdiction in the District of Delaware, or consent to such jurisdiction for the purposes of this case. "In such circumstances, it seems prudentially appropriate to address venue first since a decision to transfer would render personal jurisdiction analysis with respect to this district irrelevant." *Basile v. Walt Disney Co.*, 717 F. Supp. 2d 381, 385 (S.D.N.Y. 2010). Accordingly, this court will address Defendants' motion to transfer first.

Under 28 U.S.C. § 1404(a), "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."

In the Second Circuit, when considering a motion to transfer pursuant to § 1404(a), courts generally apply a two-step analysis. First, the court must determine whether the action could have been brought in the proposed transferee forum. If so, the court must determine whether convenience of the parties and witnesses and the interests of justice favor transfer. *See P.E.A. Films, Inc. v. Metro-Goldwyn-Mayer, Inc.*, No. 14-cv-726, 2014 WL 6769377, at *1 (S.D.N.Y. Nov. 12, 2014) (internal quotations and citations omitted).

Smith does not contest that this case could have been brought in the District of Delaware. Each Defendant is subject to personal jurisdiction in Delaware: AstraZeneca, Par, and Handa are incorporated in Delaware, and AZ UK consents to jurisdiction in Delaware for the purposes of this action.

Ordinarily, Defendants would bear the burden of making a "clear and convincing" showing that transfer is proper. *See New York Marine & Gen. Ins. Co. v. Lafarge N. Am.*, Inc., 599 F.3d 102, 114 (2d Cir. 2010). But here, Defendants move to transfer the case under § 1404(a) to enforce a forum selection clause in AstraZeneca's DS Agreements with Smith. *See Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 52 (2013) [hereinafter *Atlantic Marine*]. District courts should grant such a motion "unless extraordinary circumstances unrelated to the convenience of the parties clearly disfavor a transfer." *Id.*

I.   **Smith's Claims Against AstraZeneca**

The Second Circuit employs a four-part analysis to determine whether to transfer a claim based on a forum selection clause:

> (1) "whether the clause was reasonably communicated to the party resisting enforcement"; (2) whether the clause is "mandatory or permissive, i.e., ... whether the parties are required to bring any dispute to the designated forum or simply permitted to do so"; and (3) "whether the claims and parties involved in the suit are subject to the forum selection clause." "If the forum clause was communicated to the resisting party, has mandatory force and covers the claims and parties involved in the dispute, it is presumptively enforceable." A party can overcome this presumption only by (4) "making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching."

*Martinez v. Bloomberg LP*, 740 F.3d 211, 217 (2d Cir. 2014) (quoting *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383–84 (2d Cir. 2007)).

On this motion to transfer, "a court may consider material outside of the pleadings" – here, the DS Agreements between Smith and AstraZeneca. *Crede CG III, Ltd. v. 22nd Century Grp.,*

7

*Inc.*, No. 16-cv-3103, 2017 WL 280818, at *8 (S.D.N.Y. Jan. 20, 2017) (internal quotation and citations omitted). The forum selection clause in the DS Agreements provides that:

> The parties hereby irrevocably and unconditionally consent to the exclusive jurisdiction of the state or federal courts in the State of Delaware for any action, suit or proceeding arising out of or relating to this Agreement, and agree not to commence any action, suit or proceeding related thereto except in such courts.

(Ex. 2 § 20.2; Ex. 3 § 16.2.)

Defendants assert – and Smith does not dispute – that the forum selection clause in the DS Agreements was clearly communicated to Smith and is mandatory because it contains clear language that litigation will proceed "exclusive[ly]" in the designated forum. Smith contests (a) whether its antitrust claims are subject to the forum selection clause and (b) whether, under step four, the § 1404(a) public interest factors make enforcement unreasonable or unjust. Accordingly, this court will address steps three and four.

    A.  *Smith's Claims against AstraZeneca are Subject to the Forum Selection Clause.*

The Parties' primary dispute is how to interpret the phrase "relating to" in the forum selection clause and whether it is broad enough to reach Smith's antitrust claims.

In the Second Circuit, courts "normally apply the body of law selected in an otherwise valid choice-of-law clause" – here, Delaware law – to determine whether the claims and parties involved in the suit are subject to the forum selection clause. *See Martinez*, 740 F.3d at 217–18. (*See* Ex. 2 § 20.1 ; Ex. 3 § 16.1.)

Under Delaware law, courts apply a two-step analysis to determine the scope of forum selection clauses. First, courts determine whether the clause "is broad or narrow in scope." *ASDC Holdings, LLC v. Richard J. Malouf 2008 All Smiles Grantor Retained Annuity Tr.*, No. cv-A-6562, 2011 WL 4552508, at *5 (Del. Ch. Sept. 14, 2011) (quoting *Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 155 (Del. 2002)). Second, courts "apply the relevant scope of

8

the provision to the asserted legal claim to determine whether the claim falls within the scope of the contractual provisions." *Id.*

Regarding the first step, the forum selection clause in the DS Agreements – which covers "any action, suit or proceeding arising out of or relating to this Agreement" – is plainly "broad." *See id.* at *5. In *ASDC Holdings*, the forum selection clause at issue designated Delaware as the forum for "any claim or cause of action arising under or relating to th[e] Agreement[s]." *Id.* at *2 (alterations original). The court held that "the use of the phrase 'arising under or relating to' in the Agreements" – the same language used in the DS Agreements – "demonstrates that this is a broad forum selection clause." *Id.* at *5. Thus, the forum selection clause in the DS Agreements is "broad" under step one.

Regarding the second step,

> narrow forum selection clauses only cover claims dealing directly with rights embodied in the relevant contract. Broad forum selection clauses, on the other hand, which expressly cover, for example, all claims between the contracting parties that "arise out of" or "relate to" a contract, apply not only to claims dealing directly with the terms of the contract itself, but also to "*any issues that touch on contract rights or contract performance*."

*Id.* (emphasis added) (quoting *Parfi*, 817 A.2d at 155).

Since the forum selection clause in the DS Agreements is "broad," Defendants need only demonstrate that Smith's claims involve "any issues that touch on" the rights in or performance of the DS Agreements.

Defendants meet this standard.

Defendants assert that the DS Agreements require Smith to maintain – and thus, purchase – certain quantities of Seroquel XR. The purchases Smith made pursuant to the DS Agreements are the same purchases it now contends were unlawfully overpriced, and the same purchases for

9

which it seeks to recover overcharge damages. Accordingly, Defendants argue, Smith's claims "relate to" the DS Agreements, pursuant to which Smith purchased Seroquel XR.

This court agrees. The 2011 DS Agreement required Smith to maintain a specified target inventory level based on the quantity of Smith's inventory and its daily purchase projections. (*See* Ex. 2 §§ 5.1, 5.2.) It also required Smith to "maintain level purchase quantities of AstraZeneca Products during each calendar month." (*Id.* § 11.2.) Similarly, the 2016 Amendment to the DS Agreement required Smith to keep its inventory in a precise range and dictated that Smith's weekly purchases must comply with a specific stable purchasing range. (Ex. 3 §§ 3.1, 3.2.) The DS Agreements applied to all five strengths of Seroquel XR at issue here. (Ex. 2 at Attach. G, Ex. 3 at Attach. A-1, B.) Based on these terms, the DS Agreements governed the quantity of Seroquel XR Smith purchased from AstraZeneca.

Smith's claims "relate to" the DS Agreements because they involve "issues that touch on . . . contract performance" – namely, the required purchases of Seroquel XR from AstraZeneca. The remedies Smith seeks also relate to the DS Agreements. Smith's damages would equal the amount it overpaid per unit of Seroquel XR they purchased at the allegedly inflated price. The DS Agreements control the quantity of Seroquel XR purchased, a necessary element of this equation.

Undeterred by the standard from *Parfi* – which plainly states that *narrow* clauses only cover claims that deal directly with contractual rights – Smith insists that the lawsuit must be about a breach of the DS Agreements to "relate" thereto. It relies on several contract cases where the plaintiff's claim arose directly from a contract that did not contain a forum selection clause, and where the defendant tried to enforce a forum selection clause in a related agreement. *See Newport Disc, Inc. v. Newport Elecs., Inc.*, No. cv-12-C-10228, 2013 WL 987936, at *4 (Del. Super. Ct. Mar. 11, 2013); *Green Isle Partners, Ltd. v. Ritz-Carlton Hotel Co. L.L.C.*, No. cv-18416, 2000

WL 1788655, at *1, *2 (Del. Ch. Nov. 29, 2000); *Aveta Inc. v. Olivieri*, No. cv- 07-C-11119, 2008 WL 4147565, at *1 (Del. Super. Ct. July 28, 2008).

Unlike the defendants in those cases, Defendants here are not trying to drag Smith's claims for breach of a separate agreement into the purview of the DS Agreements and their forum selection clause. Rather, they assert that Smith's antitrust claims "relate to" the DS Agreements in the first instance. In any event, in the cases cited by Smith, the defendant could not "identif[y] specific provisions of the [] Agreement that would control Plaintiffs' claims," *Newport*, 2013 WL 987936, at *5, or articulate "some tangible, nonspeculative relationship between the lawsuit and the [] Agreement," *Green Isle*, 2000 WL 1788655 at *5; *see also Aveta*, 2008 WL 4147565, at *2 (same). Here, by contrast, Defendants have identified specific provisions of the DS Agreements that touch on Smith's claims – the provisions that require the purchase of certain quantities of Seroquel XR (*see* Defs.' Mem. in Supp., Dkt. No. 68-1 at 19), and Defendants have articulated a "tangible, nonspeculative relationship" between this lawsuit and the DS Agreements – namely, that Smith's overpricing antitrust claims and the damages it seeks to remediate arise from the purchases it was required to make under the DS Agreements.

The fact that Smith brings antitrust claims rather than contract claims does not diminish the effect of the forum selection clause in the DS Agreements. In the one Delaware antitrust case cited by both sides – *Pullen Seeds & Soil v. Monsanto Co.*, Nos. 06-cv-599, 06-cv-600, 2007 WL 2071752, at *2 (D. Del. July 18, 2007) – the court found that a broad forum selection clause reached the plaintiffs' antitrust claims.

Moreover, as Defendants point out, numerous federal courts have found that direct purchaser antitrust claims are "related to" the agreements under which the plaintiffs' made their purchases. *See In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515, 518, 523–25 (3d

11

Cir. 2019) (applying New Jersey law and holding that antitrust claims are "related to" distribution agreement that set the drug prices and governed the commercial relationship between the parties); *Valspar Corp. v. E.I. DuPont de Nemours & Co.*, 15 F. Supp. 3d 928, 933–34 (D. Minn. 2014) (holding that forum selection clause in supply contract encompassed antitrust claims); *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 858 (D. Md. 2013) (same); *see also KPH Healthcare Servs., Inc. v. Mylan N.V.*, No. 20-2065, 2020 WL 3288057, at \*4–\*6 (D. Kan. June 18, 2020) (applying Delaware law and holding that antitrust claims 'touch on' rights in a distribution services agreement).

Notably, some of the contracts in *Valspar* and *Titanium Dioxide* contained a Delaware choice of law provision and required litigation in Delaware, such that those cases were either transferred to the District of Delaware or dismissed under Rule 12(b)(3). *See Valspar*, 15 F. Supp. 3d at 930–31, 935; *In re Titanium Dioxide*, 962 F. Supp. 2d at 849, 857, 859.

In *Valspar*, the direct purchaser plaintiff argued that the forum selection clauses in its supply contracts with the defendants did not reach its antitrust claims. *See* 15 F. Supp. 3d at 933. Specifically, the plaintiff argued that its claims "do not challenge the moving Defendants' performance under the agreements or even require the Court to interpret them," such that their "mere existence . . . is insufficient to support the conclusion that [its] antitrust claims are within the scope of the forum selection clauses." *Id.* The court rejected this argument. *See id.* at 933–34.

First, the court noted that the supply contracts set the price for the plaintiff's purchases, and reasoned that the price "set the minuend for determining [the plaintiff]'s (alleged) damages." *Id.* Here, although the Wholesale Agreement sets the price of Seroquel XR, the DS Agreements set the quantity – the multiple for determining Smith's alleged damages in direct relationship with the price.

12

Second, "and more importantly," the court determined that the forum selection clauses were broad enough to reach the plaintiff's direct purchaser antitrust claims because the plaintiff purchased titanium dioxide from the defendants under the supply contracts. *See id.* "It is these very purchases that form the basis of [the plaintiff]'s claims against [the defendant] and, indeed, give it standing to sue here." *Id.* Similarly, Smith's purchases under the DS Agreements give rise to its direct purchaser claims.

Finally, the *Valspar* court noted that "another federal court" had reached the same conclusion. *See id.* at 933–34. Specifically, in *Titanium Dioxide*, the direct purchaser plaintiffs contended that their claims did not arise out of their purchase agreements because forum selection clauses do not apply to statutory tort cases where "the plaintiffs brought no contract claims and sought no contract remedies." 962 F. Supp. 2d at 858. The *Titanium Dioxide* court rejected this argument, reasoning that, unlike federal trademark or RICO violations (which do not depend on the existence of a contract), "the class members of this case have a potential cause of action only if they purchased titanium dioxide from one of the [] producers, and each member purchased pursuant to a contract." *Id.*

Here too, Smith has a potential cause of action as a direct purchaser only because it entered into commercial contracts with AstraZeneca to purchase Seroquel XR. *See id.* Unlike the plaintiff in *Parfi* – whose fiduciary duty claims were beyond the scope of the "broad" arbitration clause[1] in its underwriting agreement – Smith does not assert statutory tort claims that "would be assertable had there been no [] Agreement." 817 A.2d at 156–58. Moreover, as was the case in *Titanium Dioxide*, Smith has not cited the court to any cases involving price-fixing allegations under the

---

[1] Delaware courts "treat[] forum selection clauses 'in the same spirit' as arbitration clauses; thus, the same general principles apply in determining the scope and level of deference to be given either kind of clause." *ASDC Holdings*, 2011 WL 4552508, at *4 (internal citations omitted).

13

Sherman Act that have refused to enforce a forum selection clause in a similar agreement. *See* 962 F. Supp. 2d at 858.

Accordingly, the broad forum selection clause in the DS Agreements reaches Smith's claims and remedies that each "relate to" and "touch on" its DS Agreements with AstraZeneca.

> B.  *Enforcing the Forum Selection Clause Would Not Be Unreasonable or Unjust.*

Smith does not argue that the forum selection clause was the product of fraud or overreaching. Rather, it relies on the § 1404(a) public interest factors. In the Second Circuit, courts address these factors under step four – whether enforcement of the forum selection clause would be unreasonable or unjust. *See Allianz Glob. Corp. & Specialty v. Chiswick Bridge*, No. 13-cv-7559, 2014 WL 6469027, at *2 n.4 (S.D.N.Y. Nov. 17, 2014).

Here, Smith, "the party acting in violation of the forum-selection clause . . . must bear the burden of showing that public-interest factors overwhelmingly disfavor a transfer." *Atlantic Marine*, 571 U.S. at 67. Smith does not carry this heavy burden.

Smith argues that because the forum selection clause only binds Smith and AstraZeneca – but not the remaining Defendants – this court must give great weight to the public interest against bisecting a single controversy. It asserts that multi-party and/or multi-claim cases present the "extraordinary circumstances" to set aside a forum selection clause under *Atlantic Marine*.

This argument is wrong. Smith relies on cases that are materially distinct from its case. For example, in *Artech Information Systems, LLC v. ProTek Consulting*, No. cv-PX-17-3468, 2018 WL 3575054, at *4 (D. Md. July 25, 2018), the proposed transferee district lacked personal jurisdiction over some defendants and was improper venue for some claims; while in *Ashley Furniture Industries, Inc. v. Packaging Corp. of America*, 275 F. Supp. 3d 957, 962–64 (W.D. Wis. 2017), the defendants who were not bound by a forum selection clause relating to one

14

defendant opposed transfer. Here, Defendants allege that many of them cannot be sued in New York, but all of them agree to be sued in Delaware. As explained more fully below, this court need not choose between splitting the case and setting aside the forum selection clause in the DS Agreements – transfer to Delaware furthers both interests. *See infra* Part II.D.

Smith also contends that the public interest weighs against transfer because the alleged conspiracy was run predominantly from this district – based on Rockland County-based Par's failure to introduce a generic sooner.

This argument fails as well.

As Defendants point out, this is hardly a "localized controversy." The underlying patent litigations, negotiations, and settlements – not to mention Delaware-based AstraZeneca's sale of the drug to Smith at allegedly supracompetitive prices – all occurred outside New York. Smith itself alleges that the conspiracy was intended to – and did – affect interstate commerce and "persons . . . doing business throughout the United States . . . ." (*See* Compl. ¶¶ 30-33.)

Lastly, Smith argues that the District of Delaware is particularly overworked at this moment. But the Southern District of New York is busier than the average district court, too. The fact that the District of Delaware is busier than this district would be of marginal relevance – if Smith and AstraZeneca, the principal parties in this case, had not already decided that Delaware was their chose forum. While this court takes no pleasure in adding to the already busy docket of my colleagues in Delaware, conditions are no more favorable for speedy litigation in the Southern District of New York.

In short, Smith's stated public interest factors – which carry little to no weight in this case – are not sufficiently "extraordinary" under *Atlantic Marine* to prevent transfer.

Smith's claims against AstraZeneca should be transferred.

**II.     Smith's Claims Against the Remaining Defendants**

Having found that Smith's claims against AstraZeneca must be heard in Delaware, the only remaining question is whether it is appropriate to transfer its claims against the remaining Defendants: AZ UK, Handa, and Par. As Smith points out, there is no forum selection clause between Smith and Par, Handa, or AZ UK. Nevertheless, transfer is warranted under § 1404(a).

Under § 1404(a), courts must transfer the entire action, not individual claims. *See Wyndham Assocs. v. Bintliff*, 398 F.2d 614, 618 (2d Cir. 1968). Courts consider the following factors in their transfer analysis:

> (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, . . . (7) the relative means of the parties . . . (8) the forum's familiarity with the governing law, and (9) trial efficiency and the interest of justice.

*Pence v. Gee Grp., Inc.*, 236 F. Supp. 3d 843, 850 (S.D.N.Y. 2017) (internal citations and quotations omitted).

When a mandatory forum selection clause governs some, but not all, of the parties or claims in a given case, courts in this district evaluate whether transfer of the remaining claims is appropriate under all of the § 1404(a) factors – both public and private. *See Androb Jewelry Serv., Inc. v. Malca-Amit USA, LLC*, No. 16-cv-5171, 2017 WL 4712422, at *9 (S.D.N.Y. Sept. 25, 2017); *Pence*, 236 F. Supp. 3d at 854; *see also Bent v. Zounds Hearing Franchising, LLC*, No. 15-cv-6555, 2016 WL 153092, at *4 (S.D.N.Y. Jan. 12, 2016).

Here, "evaluation of the § 1404(a) factors does not suggest any material reason to keep this case in the Southern District of New York." *See Androb*, 2017 WL 4712422, at *9.

### A. Plaintiff's Choice of Forum

Generally, courts give a plaintiff's choice of forum "considerable weight." *See Everlast World's Boxing Headquarters Corp. v. Ringside, Inc.*, 928 F. Supp. 2d 735, 748 (S.D.N.Y. 2013). But here, three circumstances diminish that weight.

First, Smith is incorporated and located in South Carolina. It is not a citizen of the Southern District of New York and does not have any particular connection to this district. This "diminishes the deference afforded its choice to litigate here." *City of Pontiac Gen. Employees Ret. Sys. v. Dell Inc.*, No. 14-cv-3644, 2015 WL 12659925, at *4 (S.D.N.Y. Apr. 30, 2015) (citing *Zepherin v. Greyhound Lines Inc.*, 415 F. Supp. 2d 409, 411 (S.D.N.Y. 2006)). I do note that there is, however, some connection between the operative facts and the chosen forum; namely, the failure of Par – a Rockland County enterprise – to introduce a generic sooner. But Par is a Delaware corporation, which means that there is no particular reason why it should not be sued in that district.

Second, Smith "seeks to represent a nationwide class, which further diminishes the deference afforded its choice of forum." *City of Pontiac*, 2015 WL 12659925, at *4 (citing *In re Nematron Corp. Sec. Litig.*, 30 F. Supp. 2d 397, 405 (S.D.N.Y. 1998)).

Third, where a plaintiff has agreed by contract to bring suit only in a specified forum as to some of the claims at issue, and the remainder of the claims are factually related, the plaintiff's choice of a forum different from the contractual forum merits less weight. *See Androb*, 2017 WL 4712422, at *9. Here, as explained above, Smith agreed to bring suit exclusively in Delaware for any claims "related to" its purchases of Seroquel XR under the DS Agreements. And Smith's claims against the remaining Defendants are based on identical facts and seek identical relief.

For all of the above reasons, Smith's choice of forum does not favor retention in this district.

B. *Convenience of the Witnesses*

Defendants note that the current and former AstraZeneca employees who negotiated the allegedly-anticompetitive patent settlement agreements work in or near Wilmington, Delaware. As Smith correctly points out, generally the party seeking transfer must specify the key witnesses to be called and make a general statement of what their testimony will cover. However, "a specific showing is required only when the movant seeks a transfer *solely* on account of the convenience of witnesses. If the movant seeks a transfer 'on account of' several factors, his failure to specify key witnesses and their testimony is not fatal." *Pence*, 236 F. Supp. 3d at 856 (emphasis original) (internal quotations and citations omitted). In any event, in response, Smith merely points out that, if New York is inconvenient for AstraZeneca's witnesses, then Delaware is inconvenient for Par's witnesses – without identifying who those witnesses might be.

The fact is, both cities are located in the Northeastern United States along a major transportation corridor; there is no difference in convenience to anyone, which neutralizes this factor. *See id.*

C. *Convenience of the Parties*

As noted above, Smith is not located in the Southern District of New York, but rather in South Carolina. Smith would have to travel whether this case was heard in New York or Delaware. So would AZ UK and Handa, which are located in the United Kingdom and California, respectively. Thus, transfer would neither shift Defendants' inconvenience to Smith nor add substantially (or at all) to Smith's inconvenience. Smith's Spartanburg, SC headquarters are actually *closer* to the District of Delaware than the Southern District of New York. This factor, too, is neutral.

### D. Trial Efficiency and the Interest of Justice

Turning to the public interest factors, as noted above, this purportedly nationwide antitrust scheme is hardly a localized controversy.

More importantly, "as numerous courts have held, the fact that the forum selection clause indisputably governs [some] of the claims in this case, and that the remaining claims are factually related to those [] claims, weighs strongly in favor of transfer." *Androb*, 2017 WL 4712422, at *9 (collecting cases).

Smith argues that this court should retain jurisdiction over all claims and parties to avoid splitting the case. "There is a strong public interest in judicial economy," and "there is also a strong public interest in the enforceability of contracts and the protection of the parties' expectations." *Crede*, 2017 WL 280818, at *15. However, contrary to Smith's argument, this court need not "wrestle[] with these 'centrifugal considerations'" because here, there is no tension between the two policies – transfer serves both. *Id.*

This is not a case in which one party seeks to sever and transfer only certain claims. Nor is it a case in which transfer of the entire action is impossible or problematic due to jurisdictional concerns. Handa and Par – each of which is incorporated in Delaware – are subject to general personal jurisdiction in Delaware, and AZ UK consents to jurisdiction in Delaware (but not in New York) for the purposes of this litigation. Retaining jurisdiction in this district could lead to the dismissal of Defendants for lack of jurisdiction – especially for foreign entity AZ UK who might otherwise have to be sued abroad. Transfer to the District of Delaware is the only way both to keep the action together – thereby serving judicial economy – *and* to honor the forum selection clause in Smith's DS Agreements with AstraZeneca. Thus, the interest of justice weighs heavily in favor of transfer.

*E. Remaining Factors*

Defendants concede that many of the remaining factors – the location of documents and ease of access to sources of proof, the relative means of the parties, the forum's familiarity with the governing law – are irrelevant.

In sum, the private interest factors are essentially neutral, while the interest of justice weighs heavily in favor of transferring this case to the District of Delaware. "There is no rigid formula for balancing these factors and no single one of them is determinative. Instead, weighing the balance is essentially an equitable task left to the Court's discretion." *Citigroup Inc. v. City Holding Co.*, 97 F.Supp.2d 549, 561 (S.D.N.Y. 2000) (citations and internal quotation marks omitted).

This court finds that transfer is warranted under § 1404(a) as to all claims against all Defendants.

## CONCLUSION

Defendants' motion to transfer the case to the District of Delaware is GRANTED. This constitutes the decision and order of the court. It is a "written opinion." The Clerk of Court is respectfully directed to close the open motion at Dkt. No. 68, and transfer the case to the United States District Court for the District of Delaware.

Dated: August 11, 2020
New York, New York

_____
Chief Judge

BY ECF TO ALL PARTIES